**TRANSPORTATION REVENUE MANAGEMENT, INC.,**
Plaintiff,

v.

**FIRST NH INVESTMENT SERVICES CORP., Defendant.**

Civ. A. No. 92–2319 PLF.

United States District Court,
District of Columbia.

May 23, 1995.

Henry E. Seaton, John T. Husk, Law Offices of Henry E. Seaton, Falls Church, VA, for plaintiff.

Robert J. Gallagher, Northampton, MA, for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRIEDMAN, District Judge.

Plaintiff, Transportation Revenue Management, Inc. ("TRM"), brought suit against defendant First NH Investment Services Corp. ("First NH") for failure to pay claims filed against a surety trust fund managed by First NH. Those claims were made by six motor carriers, and the parties have stipulated that TRM is the lawful assignee of the six Interstate Commerce Commission authorized motor carrier claimants on whose behalf it has brought suit.[1] The surety trust funds were

---

1. The six carriers are BPI Transportation, Inc. ("BPI"), H & V Leasing, Inc. ("H & V"), Landair Transport, Inc. ("Landair"), RJR Elite Trucking, Inc. ("RJR"), Reaves Enterprises, Inc. ("Reaves"), and W–H Transportation, Inc. ("W–H").

posted by defendant's principal, Perth Enterprises, Inc., d/b/a Transport Source ("Transport Source"), in accordance with the requirements of 49 U.S.C. § 10927(b) and 49 C.F.R. § 1043, for the purpose of assuring the financial obligations of Transport Source.

TRM alleged that Transport Source was acting as a property broker in interstate commerce pursuant to 49 U.S.C. § 10102(1) and 49 C.F.R. § 1045.2(a), (c) when it arranged for the six motor carriers to transport goods. It further alleged that the carriers filed claims against the surety trust fund managed by First NH after Transport Source filed for bankruptcy protection and failed to pay the carriers' invoices. Finally, it alleged that First NH's Trust Administrator improperly denied the claims on the ground that Transport Source was acting as a freight forwarder rather than as a property broker in its transactions with the six motor carriers, thereby rendering the carriers ineligible for funds from the surety trust fund. TRM contended that First NH breached its duty under the Trust Fund Agreement filed with the ICC, Form BMC–85, to exclusively administer and manage the Trust Fund. TRM sought payment in the amount of $4,400.97.

TRM also alleged that First NH breached its duty of good faith and fair dealing because its Trust Administrator failed to comply with a Trust Administration Agreement and Power of Attorney Agreement which purport to outline the specific procedures for administering the Trust. It further alleged that First NH was negligent in permitting its Trust Administrator to continue to deny the carriers' claims without inquiry of Transport Source or any evidence that Transport Source acted as a freight forwarder rather than as a property broker in its transactions with the six carriers. TRM sought $13,-200.00 in punitive damages from First NH for breach of the fiduciary obligation of a Trustee which subjected TRM to the costs of litigation.

First NH asserted that it has not made payment because it was advised by Transport Source that the carriers' claims arose out of Transport Source's surface freight forwarder operation, and this operation is not covered by the Trust Fund Agreement. First NH asserts that TRM did not demonstrate that the six carriers' claims arose from Transport Source's operations as a property broker, the only type of claims covered by the Trust Agreement. First NH denied that it breached its duty to properly administer and manage the Trust fund.

The parties stipulated that First NH and Transport Source filed a surety Trust Fund Agreement on Form BMC–85 with the ICC, in which First NH agreed to "exclusively manage the corpus [of the Trust] and to make payments in good faith." In addition, the parties stipulated that defendant's principal, Transport Source, has brokerage authority pursuant to 49 U.S.C. § 10102(1) and 49 C.F.R. § 1045.2.

This case was tried before the Court without a jury. The Court enters judgment for the defendant on all claims. The following constitute the Court's Findings of Fact and Conclusions of Law.

## I.  FINDINGS OF FACT

### A.  Arrangements Between And Among The Parties

The evidence at trial demonstrated that plaintiff TRM is the assignee of six ICC authorized motor carriers who transported interstate shipments arranged by Transport Source for which they have not been paid. Transport Source operates both as a property broker and as a freight forwarder. Both property brokers and freight forwarders arrange for carriers such as TRM's six assignors to transport goods, but property brokers do not play a role in the actual assembly or carriage of the goods.[2]

---

**2.** A property broker arranges the transportation of property by an authorized motor carrier, but is not permitted to act as a carrier. 49 U.S.C. § 10102(1); 49 C.F.R. § 1045.2. A freight forwarder, by contrast, plays a role in the assembly, consolidation, break bulk and distribution of shipments, assumes responsibility for the shipment from the place of receipt to the place of destination, uses carriers subject to ICC jurisdiction and may act as a carrier. 49 U.S.C. § 10102(9); 49 C.F.R. §§ 1045.7, 1084.1 (1994).

The Interstate Commerce Act requires property brokers, but not freight forwarders, to furnish an approved security to ensure that the transportation for which the property broker arranges has been provided. 49 U.S.C. § 10927(b); 49 C.F.R. § 1043.4. The security requirement guarantees that motor carriers who provide transportation services that are arranged by property brokers will be paid for their services. If a property broker chooses to comply with the security requirement by making a bank trust fund deposit, the property broker and trustee must use the ICC's prescribed Trust Fund Agreement, Form BMC–85. *See* 49 C.F.R. § 1043.4(d).

Transport Source deposited $10,000.00 into a surety trust fund managed by defendant First NH in order to meet its property broker security obligation. A BMC–85 Trust Fund Agreement between Transport Source and First NH was filed with the ICC; the Trust Fund Agreement designates Transport Source as Trustor and First NH as Trustee. Pl.Ex. 1. Under the Agreement, First NH is obligated to pay, up to a limit of $10,000.00, any sum that it in good faith determines that Transport Source has failed to pay, and would be held legally liable to pay, for its work as a property broker. Pl.Ex. 1 ¶ 6.

Transport Source as Trustor of the trust fund agreement also signed a Power of Attorney Agreement with American Traffic Exchange ("AMTEX"). Pl.Ex. 7.[3] The Power of Attorney Agreement authorizes AMTEX to act for Transport Source in all matters related to the Trust. It provides that the Trustee, First NH, through a Trust Administrator, will submit claims against the surety trust fund deposit to Transport Source; if a claim is not disputed within 72 hours, the Trust Administrator will authorize payment of the claim by the Trustee. Pl.Ex. 7 ¶ 4. In the event of a dispute, the Trust Administrator is required to give notice of the dispute to the motor carrier claimant and await the resolution of the dispute by arbitration or litigation.

AMTEX and the Trustee, First NH, entered into their own agreement to administer the trust funds deposited by any AMTEX property broker member into the Trust managed by First NH, and AMTEX and First NH agreed to hire a trust administrator. Pl.Ex. 8 at 2. At all times relevant to this action, David P. Carney was the Trust Administrator. First NH agreed to pay claims from trust funds only upon written instructions from Mr. Carney. *Id.* ¶ 3. The agreement also provided that interest earned on the trust funds would be paid to AMTEX for the purpose of compensating the Trustee (First NH) and the Trust Administrator (Mr. Carney). Pl.Ex. 7, ¶ 5; Pl.Ex. 8, ¶ 1.

## B. Procedures for Processing Surety Trust Fund Claims

At trial, Mr. Carney explained that as Trust Administrator he acts as the sole gatekeeper to the claims process; First NH does not have any involvement with the claims process unless and until Mr. Carney instructs First NH that a claim is undisputed and recommends that it be paid. Tr. 41. If a claimant has not tendered enough information to make its claim presumptively valid, Mr. Carney informs the claimant and requests it to provide additional information before he will submit the claim to the property broker to determine whether it is disputed. Tr. 64. He does not himself investigate the validity of the claim. Only when he determines that a claim is properly supported, and presumptively valid, does Mr. Carney then present the claim to the property broker for a response. Tr. 46. Once a claim is permitted to enter the claims process, if the property broker does not dispute the claim within 72 hours, then Mr. Carney informs First NH that payment should be made. If the property broker disputes the claim, Mr. Carney awaits a resolution of the dispute through arbitration or litigation; he does not himself adjudicate the claim. Tr. 68.

In order to get a claim past Mr. Carney and presented to the property broker for a

---

**3.** AMTEX is a not-for-profit association of property brokers founded by Paul Carrano, who was the President of Transport Source at all times relevant to this action. Transport Source was a member property broker of AMTEX.

response, a claimant must (1) document the debt, (2) demonstrate whether the carrier was acting as a common or contract carrier by presenting the ICC operating authority under which it transported the goods and (depending on which one) (3) provide either the contract or the carrier's filed tariff. The claimant must also (4) provide evidence that Transport Source was acting as a property broker in the transaction rather than as a freight forwarder. Tr. 47–49. Mr. Carney testified that a bill of lading and invoice, standing alone, are not sufficient to demonstrate entitlement to Trust funds because those documents merely document the debt; they do not indicate under what regulations the carrier's services were performed, whether the rate charged by the carrier was proper, or whether the trustor acted as property broker in the transaction. Tr. 63–64, 97–98.[4]

Frank Agnos, a senior collector at plaintiff TRM, testified that the claims processing procedure followed by Mr. Carney is unlike the procedure he has experienced in filing numerous claims against *other* property broker surety trust fund deposits. He testified that he generally provides *only* freight bills and bills of lading and that, in his experience, such documentation is sufficient to initiate the claims process by presentation of the claim to the property broker for response. Tr. 132. He explained that if the validity of a claim or the rate charged is disputed by the property broker, the trustee generally commences an interpleader action or recommends that the two parties litigate the dispute. Tr. 132. In the interpleader cases in which Mr. Agnos has been involved, the courts relied on freight invoices and bills of lading to substantiate carriers' claims. Mr. Agnos was not involved in the claims at issue in this case. Tr. 143.

---

4. Mr. Carney explained that he specifically requires proof of ICC operating authority and the filed tariff or written contract between the parties because different rules apply to contract and common carrier services. Tr. 97. For example, a common carrier must file a tariff with the ICC and can only charge the rates specified in the tariff. A contract carrier is required to have a written contract with the property broker and can charge the rates contained in the contract. Tr. 97, 99. Mr. Carney testified that he needed

## C. The Specific Claims

Transport Source filed a petition for bankruptcy on April 16, 1992. Its petition listed each of the six carriers who have assigned their claims to TRM as a creditor of Transport Source in amounts equal to or greater than those sought in this suit. Pl.Ex. 3. TRM filed claims on behalf of five of the six carriers against Transport Source's surety posted with First NH. Mr. Carney denied each of the five claims. Mr. Carney never submitted three of the claims (Landair, RJR and Reaves) to Transport Source for its response because Mr. Carney determined that he had not been provided sufficient information regarding "the compliance of the carrier [with applicable laws and regulations] and the existence of a property broker understanding." Carney Testimony, Tr. at 46. He did submit two claims (BPI and W–H) to Transport Source, which disputed the claims. Def.Ex. 2 and 4. The sixth claim (H & V) that is part of this litigation was never submitted to Mr. Carney for processing.[5]

The Landair claim consisted of a Landair invoice, a bill of lading, and a shipping order listing Landair as carrier. Pl.Ex. 2, Attachment C. The Trust Administrator denied the claim because "neither of the Documents of Movement physically cite Transport Source as a party responsible for the payment of your client's freight charge." Pl.Ex. 4. The letter of denial suggested that written evidence could be presented in support of the claim. *Id.* No additional documentation was presented and the Landair claim was never submitted to Transport Source. Tr. 101.

The RJR claim consisted of an RJR Invoice and a bill of lading listing RJR as carrier. Both documents listed Transport Source as shipper. Pl.Ex. 2, Attachment D. Mr. Carney informed plaintiff that the desig-

---

this information in order to ensure that the trustee does not overpay or underpay any claim. Tr. 97–98.

5. BPI's claim is for $800.60. Landair's claim is for $718.27. RJR's claim is for $850.00. Reaves's claim is for $468.60. W–H's claim is for $560.00. The H & V claim is for $1003.50, although, as noted, it was never submitted to Mr. Carney prior to this lawsuit.

nation of Transport Source as "shipper" indicated that Transport Source was acting either as a consignee or as a freight forwarder, not as an ICC licensed property broker. Pl. Ex. 4. Mr. Carney denied the claim "unless sufficient written documentation [could] be presented to contridict [sic] the intended contractual relationship of the parties as reflected in the shipping documents." *Id.* No additional documents were ever provided and the claim was never presented to Transport Source. Tr. 100.

The Reaves claim consisted of a Reaves invoice to Transport Source, an inbound truck receipt, and a shipping order listing Reaves as carrier. Pl.Ex. 2, Attachment E. Mr. Carney requested a copy of Reaves' ICC operating authority and filed tariff or the written contract between the parties. Pl.Ex. 4. The documents were never provided and the claim was never presented to Transport Source. Tr. 100.

The BPI claim consisted of a BPI freight invoice (which does not list Transport Source), three bills of lading listing Transport Source as the carrier, and a Transport Source rate confirmation document listing BPI as motor carrier and describing the delivery instructions. Pl.Ex. 2, Attachment A. Mr. Carney testified that he did not find this information sufficient to establish that BPI was dealing with Transport Source as a property broker. Tr. 104. He pointed out that the bills of lading listed Transport Source as "carrier," but he acknowledged, and Mr. Agnos confirmed, that some carriers in the industry improperly list the property broker as "carrier" on their bills of lading. Tr. 103, 138. Mr. Carney therefore requested a copy of BPI's ICC operating authority and filed tariff or the written contract between the parties. Pl.Ex. 4. He testified that he never received the requested information. Tr. 100.

Mr. Carney nevertheless submitted the BPI claim to Transport Source because the rate confirmation and other documents did identify Transport Source as a party to the transaction. Tr. 117. He received a response from Transport Source disputing the claim. Def.Ex. 2. Transport Source provided Mr. Carney with a "Transportation Contract Between A Motor Carrier Freight Forwarder And A Motor Carrier Service Supplier" signed by BPI Transportation and Transport Source. Pl.Ex. 1. Finding this evidence sufficient to create a genuine dispute about the claim, Mr. Carney denied the claim. In doing so, he explained that "Perth Enterprises ... is disputing the legitimacy of your clients' claim.... The basis of this dispute is that B.P.I. Transportation accepted the assignment of this freight movement under Freight Forwarder/Motor Carrier Service supplier context—not under Property Broker/Motor Carrier regulation." Pl.Ex. 4. Mr. Carney also cited "inconsistencies surrounding B.P.I.'s eligibility in and to the freight charges due the 'Carrier of Record' per bill of lading # 207 and lawfulness of freight charge in accord with B.P.I.'s filed tariff." *Id.*

The W–H claim consisted of a W–H invoice and two shipping orders listing CA Transport as Carrier. The documents admitted in evidence at trial show that at some time CA Transport was scratched out and W–H was written in as the Delivering Carrier. Pl.Ex. 2, Attachment F. Mr. Carney informed W–H that according to his reading of the shipping orders, "only [CA Transport] could legitimately file a claim against the surety." Pl.Ex. 4. Mr. Carney submitted the claim to Transport Source, however, because a rate confirmation from Transport Source to W–H suggested to him that Transport Source had assumed a financial obligation in connection with the transaction. *Id.* Transport Source advised Mr. Carney that it disputed the claim and requested 15 days to provide evidence that Transport Source acted as a freight forwarder (not property broker) in the W–H transaction. Def.Ex. 4. There is no indication in the record whether Transport Source submitted any evidence to substantiate its dispute or whether TRM was advised that Transport Source was disputing the claim.

The H & V claim consisted of an H & V freight invoice, a bill of lading listing Transport Source as carrier, and a Transport Source document listing H & V as motor carrier and describing the delivery instructions. Pl.Ex. 2, Attachment B. Mr. Carney testified at trial that these three documents

would have been insufficient for him to determine whether Transport Source had acted as a property broker in the transaction, but that the H & V claim had never been submitted to him prior to this litigation. Tr. 109, 114. At trial, defendant raised the defense that the H & V transaction involved a shipment of gravel, which is exempt from ICC property broker security regulations. Mr. Carney testified that had the claim been presented to him he would have denied it. Tr. 106.

### D. Alleged Breach of Duty to Administer and Manage the Trust Fund

Plaintiff's witness Mr. Agnos testified that the general practice in the industry is to pay claims based solely on the freight bills and bills of lading for the particular transaction. Mr. Agnos asserted that the freight bills and bills of lading presented to Mr. Carney in this case all involved truckload shipments, such as those handled by a property broker. Tr. 136. He explained that in a freight forwarder transaction, there generally are a series of less than full truckload bills of lading listing the freight forwarder as "carrier" and a master bill of lading listing the freight forwarder as "shipper" or "consignee" and reflecting all the less than truckload bills. Tr. 136–37.[6]

Mr. Agnos' testimony does not conflict with Mr. Carney's testimony. Mr. Carney testified that he is unable to tell from a bill of lading whether the entity that arranged the transportation of the goods was acting as a property broker or freight forwarder. Tr. 60. Therefore, as Administrator of the Trust managed by First NH, Mr. Carney simply determined that it is not proper to authorize the payment of claims based solely on freight bills and bills of lading. Tr. 50. Mr. Carney credibly explained that before he commences the claims process he requires the claimant to establish that it is a proper claimant under the Trust Agreement—that is, an ICC authorized motor carrier carrying goods under an

arrangement with a *property broker*—and that it is charging the correct amount for its carrier services. Tr. 47–49.

▪ The testimony of both Mr. Carney and Mr. Agnos demonstrates to the Court that it is impossible to determine solely from the bills of lading submitted in this action that Transport Source was operating as a property broker. The documents themselves do not specify that Transport Source was acting as a property broker. Both Mr. Carney and Mr. Agnos acknowledged that property brokers sometimes are unlawfully listed as "carriers" on bills of lading. Mr. Agnos, plaintiff's own witness, also explained to the Court that bills of lading used in freight forwarder transactions also may list the freight forwarder as "carrier." Tr. 136–37. As a result, the Court finds that the BPI and the H & V bills of lading, which list Transport Source as "carrier," could well indicate that Transport Source was acting as a freight forwarder, and not a property broker, in these transactions.

While Mr. Agnos testified that the bills of lading involved in this case all involved truckload shipments, plaintiff did not provide any evidence to Mr. Carney or to the Court that these bills of lading were not master bills of lading reflecting the assembly or consolidation of other shipments. At any rate, Mr. Carney made it clear that he does not understand relevant regulations to prohibit a freight forwarder from arranging a truckload shipment. Tr. 73. For that reason, his policy as Trust Administrator was to place the burden on the claimant to demonstrate that the parties to the shipping transaction agreed to deal with each other in a property broker-carrier relationship. Tr. 70–73. The Court finds that the documents submitted with the BPI, H & V, Landair, RJR, Reaves and W–H claims, even if they involved truckload shipments, do not themselves prove that a property broker relationship existed.

---

6. Mr. Agnos acknowledged that he did not work on the particular claims at issue in this litigation. He explained that according to its general practice, however, Transportation Revenue would supplement the documents submitted with a claim if requested to do so by the trustee. He testified that in the event that Transportation

Revenue is unable to obtain additional documentation to support a claim, it sometimes submits affidavits regarding the conditions of the particular transaction. Tr. 155. There was no evidence at trial that any affidavits were ever submitted to Mr. Carney.

Another problem with relying solely on the bills of lading, freight bills and invoices filed by TRM is that the documents, in the absence of other information, do not demonstrate that the rates charged by the carriers in these transactions were proper. Plaintiff has submitted Transport Source's bankruptcy schedule which lists debts to BPI, W–H, Landair, RJR, Reaves and H & V. Although this information may confirm that Transport Source concurred with the rate charged by the carriers, the schedule does not cure the lack of evidence provided to Mr. Carney that the debts to these carriers were incurred in property broker transactions. Furthermore, Mr. Carney testified that he was not even aware of this information prior to July 19, 1993. Tr. 50.

There is yet another and independent ground for the Court to find that First NH through Mr. Carney did not breach its duty to administer and manage the trust fund properly. Mr. Carney informed TRM that additional information was needed to substantiate the Landair, RJR, and Reaves claims, but no additional information was ever provided. While Mr. Agnos testified as to his general practice in similar circumstances, and the fact that he would normally submit affidavits or other documentation if requested, his testimony is entitled to much less weight than Mr. Carney's because Mr. Agnos never worked on the claims at issue in this litigation. Furthermore, the fact is that defendant did request additional documentation through Mr. Carney, but TRM did not provide the documentation requested. Nor is there any evidence that TRM prepared or submitted affidavits explaining that there was no documentation prior to the commencement of this litigation.[7] Except for the fact that the bankruptcy schedule suggests that Transport Source concurs in the rates charged by TRM's assignors, the documents submitted to the Court suffer from the exact same deficiencies as those submitted to Mr. Carney.

The claims submitted to Mr. Carney by TRM on behalf of Landair, RJR, and Reaves did no more than document a debt. They did not establish a property broker-carrier transaction and they did not demonstrate that the rates charged were proper. Thus, the Court finds that it was reasonable for Mr. Carney to deny the Landair, RJR, and Reaves claims.

■ Mr. Carney's denial of the BPI and W–H claims after they were disputed by Transport Source is not inconsistent with Mr. Agnos' testimony either. Furthermore, Mr. Carney's denying the claims was not unreasonable conduct for a trust administrator. The BMC–85 agreement does not require the surety to pay disputed claims. It states that the Trustee shall only pay sums which it "in good faith, determines that [Transport Source] has failed to pay and would be held legally liable by reason of [its] failure to perform faithfully its contracts, agreements or arrangements for transportation by authorized motor carriers...." Pl.Ex. 1 ¶ 6. In the case of the BPI claim, Transport Source disputed the claim and produced a copy of a Freight Forwarder contract between Transport Source and BPI. Mr. Carney informed BPI of the dispute and denied the claim. Transport Source disputed the W–H claim on the same basis as the BPI claim. The record does not indicate whether the nature of the W–H dispute was ever communicated to TRM or whether Transport Source submitted any evidence in support of its dispute.

Mr. Agnos testified that, in his experience, in the face of such disputes trustees either commence an interpleader action or *recommend that the claimant and trustor litigate the dispute.* Tr. 132. Although he acknowledged that interpleader is utilized in some cases, Mr. Carney testified that First NH simply chose not to resort to that method of claims resolution in these cases and that it was up to TRM to try to resolve the dispute either through arbitration or litigation. Thus, there really is no conflict between the testimony of Mr. Carney and that of Mr.

---

**7.** Affidavits were submitted by TRM in connection with the summary judgment motions filed in this action, but plaintiff's motion was denied by Judge Harris who found that "a question of fact exists with respect to whether the disputed claims arose from Transport Source, Inc.'s activities as a freight forwarder or a property broker." Order of January 27, 1994. *See also supra* note 6.

Agnos. The Court finds that Mr. Carney's decision not to pay the BPI and W–H claims until the dispute was resolved was reasonable and does not evidence bad faith. The Court also finds that the evidence presented by TRM in this litigation does not establish that the BPI and W–H claims involve a property broker-carrier transaction or demonstrate that the rates charged were proper.

Finally, the H & V claim was not submitted to Mr. Carney prior to this litigation. The Court finds that it involved the transportation of gravel which is exempt from the property broker security regulations. 49 C.F.R. § 1043.1(b).

### E. Alleged Conflict Of Interest And Breach Of Fiduciary Duty

■ Plaintiff presented evidence that Mr. Carney was both the Trust Administrator and a member of the AMTEX Board of Directors, that AMTEX paid Mr. Carney's salary for serving as Trust Administrator out of interest earned on the trust fund, and that AMTEX is composed of property brokers who deposit funds into the trust managed by First NH and administered by Mr. Carney. On this basis, plaintiff alleges that Mr. Carney had a conflict of interest and violated his fiduciary duty. Plaintiff cites the BMC–85 which requires that the Trustee and Trustor:

> as evidenced by their signatures to this agreement, acknowledge and certify that (a) said Trustee, neither has nor expects to have any interest, financial, proprietary, or otherwise, whatsoever, in Trustor....

Pl.Ex. 1 ¶ 3.

The Court finds that the triangular relationship between First NH, Mr. Carney and AMTEX does not establish a conflict of interest under BMC–85. No evidence in the record establishes that First NH had a financial or other interest in Transport Source or in AMTEX. Plaintiff has not persuaded the Court that First NH would benefit by protecting the trust funds from eligible carriers. In the case of Transport Source, after all the claims against the trust fund have been resolved, the corpus of the fund will revert back to Transport Source, Tr. 74, and presumably become part of the bankruptcy estate. First NH will receive any outstanding interest on the trust funds. The payment of fees to the trustee out of interest earned on Transport Source's deposit into the trust fund is a standard arrangement and is not suggestive of a conflict of interest. The Court therefore finds that First NH did not violate the provisions of the BMC–85 trust fund agreement.

Similarly, Mr. Carney, who administered the trust managed by First NH and was compensated for his services out of interest earned on the trust fund, had no financial or other interest in Transport Source or AMTEX. The facts that AMTEX is an association of property brokers who have deposited money into the trust fund managed by First NH and that Mr. Carney serves on AMTEX's Board of Directors do not establish a conflict of interest.

■ Plaintiff's claims that First NH breached its fiduciary duties under the Trust Agreement and was negligent in delegating authority to Mr. Carney are based upon a tort theory that holds insurers liable for the bad faith refusal to pay a claim by an insured. The cases on which it relies recognize that there is a special duty on insurers not to refuse or fail to pay a valid claim by the insured without justification. *See, e.g., Washington v. Group Hospitalization, Inc.,* 585 F.Supp. 517 (D.D.C.1984). To recover under that tort theory, however, a plaintiff must show that defendant did not have a reasonable basis for denying benefits under the policy and that it knew when it denied the claim that it lacked a reasonable basis or recklessly disregarded its lack of a basis. *See Messina v. Nationwide Mut. Ins. Co.,* 998 F.2d 2, 4 (D.C.Cir.1993); *Washington v. Group Hospitalization, Inc.,* 585 F.Supp. at 520. The Court need not address the question of whether this theory extends to the facts of this case in light of its findings that Mr. Carney's denial of TRM's claims was reasonable.

## II. CONCLUSIONS OF LAW

1. A property broker is "a person who, for compensation, arranges, or offers to arrange, the transportation of property by an

authorized motor carrier." 49 U.S.C. §§ 10102(1); 49 C.F.R. § 1045.2.

2. Property brokers are required to post a surety bond or bank trust deposit in the amount of $10,000.00 to ensure that the motor carriers it retains are paid for their services. 49 U.S.C. § 10927(b); 49 C.F.R. § 1045.2.

3. A freight forwarder is a person who: [provides] transportation of property for compensation and in the ordinary course of business:

(A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;

(B) assumes responsibility for the transportation from the place of receipt to the place of destination; and

(C) uses for any part of the transportation a carrier subject to the jurisdiction of the Interstate Commerce commission under subchapter I, II, or III of chapter 105 of this title.

49 U.S.C. § 10102(9); *see* 49 C.F.R. § 1084.1.

4. A freight forwarder may assemble and consolidate numerous small shipments into one truckload shipment and arrange for transport as part of a freight forwarder transaction. *Travelers Indem. Co. v. Alliance Shippers, Inc.,* 654 F.Supp. 840, 842 (N.D.Cal.1986); *Eastern Express, Inc. v. United States,* 198 F.Supp. 256, 264 (S.D.Ind. 1961), *aff'd,* 369 U.S. 37, 82 S.Ct. 640, 7 L.Ed.2d 548 (1962); *see Regular Common Carrier Conference v. United States,* 793 F.2d 376, 378 (D.C.Cir.1986).

5. At all times relevant to this dispute, there was no requirement that a freight forwarder post a surety bond or bank trust agreement.

6. Regulations governing carriers, which were valid until June 22, 1992, required a contract carrier involved in a transaction with a property broker to have a written contract evidencing the agreement. 49 C.F.R. § 1053. These documents provide evidence of the shipping rate agreed upon by the contract carrier and the property broker.

7. Regulations governing common carriers require the carrier to file a tariff with the ICC. 49 C.F.R. § 1312. The filed tariff provides evidence of the shipping rate that the carrier is permitted to charge.

■ 8. A trust administrator may require that a claimant against a property broker surety trust fund deposit document the existence of the debt, demonstrate whether the carrier was acting as a common or contract carrier by presenting its ICC operating authority, and, depending on which one, provide either the contract or the carrier's filed tariff, and provide evidence that the trustor was acting as a property broker in the transaction.

9. Requesting copies of a carrier claimant's written contract or filed tariff is a legitimate means of establishing the carrier's operating authority and the proper rates to be paid in a shipping transaction.

■ 10. A trust administrator is not required to investigate the claims made against a trustor if the claimant has not provided sufficient information to demonstrate that the claimant is presumptively entitled to payment of its claim out of trust funds.

■ 11. Any carrier who has not been paid for services performed in a transaction with a property broker who posted funds in a surety trust and whose claim against the trust fund has been denied may make a claim directly against the surety bond or bank trust agreement. *Milan Express Co. v. Western Surety Co.,* 792 F.Supp. 571 (M.D.Tenn.1992).

12. While some trustees have made payments from property broker trust funds solely on the basis of freight bills and bills of lading, it was reasonable for Mr. Carney to deny the Landair, RJR and Reaves claims in the absence of the requested supplemental information.

13. TRM has not provided sufficient evidence that Landair, RJR and Reaves were entitled to payment from trust funds or of the correctness of the claimed shipping rate.

14. BMC–85 does not require a trustee to make payment on a claim if the trustor has

provided evidence of a genuine dispute about the validity of the claim.

15. Mr. Carney reasonably denied BPI's claim when Transport Source provided a copy of a "Transportation Contract Between A Motor Carrier Freight Forwarder And A Motor Carrier Service Supplier" signed by BPI Transportation and Transport Source. Pl.Ex. 1.

16. Mr. Carney was not required to investigate or adjudicate the dispute between TRM and Transport Source regarding the BPI claim.

17. TRM has not provided sufficient evidence of BPI's entitlement to payment from trust funds or of the correctness of the claimed shipping rate.

18. Mr. Carney reasonably denied the W–H claim when Transport Source informed him that it disputed the claim and requested 15 days to submit additional information.

19. Mr. Carney was not required to investigate or adjudicate the dispute between TRM and Transport Source regarding the W–H claim.

20. TRM has not provided sufficient evidence of W–H's entitlement to payment from trust funds or of the correctness of the claimed shipping rate.

21. The transportation of gravel is exempt from ICC property broker security regulations. 49 C.F.R. § 1043.1(b).

22. TRM is not entitled to payment from the trust fund for the H & V claim which involved the transportation of the exempt commodity gravel.

23. There is no evidence that Mr. Carney or First NH had a financial or other interest in Transport Source.

24. There is no evidence that defendant has acted in bad faith or negligently in administering the trust fund or that Mr. Carney's denial of TRM's claims was unreasonable.

On the basis of the foregoing Findings of Fact and Conclusions of Law the Court finds that defendant is entitled to Judgment. An accompanying Order consistent with this Opinion, Findings of Fact and Conclusions of Law has been filed this same day entering judgment for Defendant.

SO ORDERED.